Ranney, J.
We do not find it necessary to express any opinion, as to the organization or powers of this railway company, prior to its acceptance of the provisions of, and organization under, the street railway act of April 10,1861. That it had, in poinif of fact, organized under the corporation act of May 1, 1852, and had, before the passage of the act of 1861, constructed a street railroad, from a point in the city of Cincinnati to Kirby street, within the limits of the incorporated village of Cumminsville, is conceded. These were the very conditions which entitled it to become a corporate body, and thereafter to maintain and operate its railroad, under the street railway act. 58 O. L. 66, sec. 6. Whether before, its organization and operations were legal or illegal, it was given the opportunity of becoming a legal corporation under this act, and thereby investing itself with all the powers and privileges which the act confers. But it is also undeniably clear, that, from thence, it possessed no other powers, either for operating or extending its road, and was subject to all the regulations and restrictions provided for in the act. And this raises the first question presented in the case. It is objected on the part of the defendants in error, that by the 5th section of this act, the assent of the corporate authorities of the vil *539 lage of Cumminsville was required, before the railway could be legally constructed within its limits; and as no such assent was ever obtained, it is insisted, that the further extension of the railway upon one of the streets of the village, was properly enjoined; and that, for the same reason, that portion of the railway previously constructed, upon the same street, was properly held to be a nuisance, and ordered to be taken up. If this section of the law is applicable to the case, the first proposition, as to the further extension of the railway, is cer tainly correct; but it by no means follows that the second is also correct. Prior to the passage of this act, the company had constructed its road to Kirby street, and the 6th section of the act provides, that when a company organized under the act of 1852, has “ constructed a street railroad,” and shall organize under this act, it shall be invested with all the powers of this act, in operating and maintaining the street railroad of such company.” It seems probable that the legislature intended to legalize all such structures; and if so, there is nothing plainer than that they could not afterward be treated as nuisances. But in the view taken by the court, it becomes unnecessary to decide this question, and we return to the question whether this fifth section, requiring the assent of the corporate authorities, is applicable to the corporation of Cumminsville. And the court is of the opinion that it is not. This section provides:
“ That hereafter no street railroad shall be constructed, or commenced, until the consent of the city council, or corporate authorities, of the city, town, or village, wherein such road is to be constructed, shall have been first obtained; and it shall be competent for the city council, or corporate authorities of any city, toion, or village, to agree with any street railroad company organized in pursuance of this act, or with any individual or company of'individuals desiring to construct a street railroad in such city, town or village, upon the manner and upon the terms and conditions upon which such corporation, individual, or company of individuals, shall construct and operate a street railroad in such city, town, or village : Provided, that no grant to occupy any street, lane, or avenue, or public *540 ground, in any city of the first class, containing a population exceeding eighty thousand iinhabitants, shall be made, except in accordance with sections fifteen and sixteen of an act-passed March 3, 1860, relating to cities of the first class haying a population exceeding eighty thousand inhabitants.”
In this connection, also, the 7th section deserves to be quoted:
“ Street railroads may be located and constructed in part within, and in part without, the limits of any city, town or village; and any road constructed within the limits of any city, town or village, may be extended without the limits thereof: Provided, that before such railroad shall be constructed upon any road, street, avenue, public way or ground, without such limits, the company, or public officer, or public authorities, owning or having charge thereof, shall agree with the railroad company upon the manner and upon the terms and conditions upon which the same shall be occupied or used; but such agreement shall not be necessary to the crossing thereof.”
Prior to the passage of the act of May 3,1852, “ for the organization of cities and incorporated villages,” and when the present constitution of the state took effect, Cumminsville existed, under a special act of incorporation, as a special road district. The first section of the act of 1852, provides :
“ That all corporations which existed when the present constitution took effect, for the purposes of municipal government, either general or special, and described or denominated in any law then in force as cities, towns, villages or- road districts, shall be and they are hereby organized into cities and incorporated villages, with the territorial limits to them respectively prescribed or belonging, in manner following: All such municipal corporations as in any such law are denominated cities shall be deemed cities, and those denominated towns, villages, or special road districts shall be deemed incorporated villages, to be respectively governed as cities or incorporated villages, and in case of the latter, for general or special purposes, as provided in this act. And all acts now in force for the organization or government of any such municipal corporations, shall be and they are hereby repealed: Provided, *541 that such repeal shall not destroy, or bar, any right of property, action or prosecution, which may be vested, or exist, at the time this act takes effect.”
This classification is . completed in the 4th section in these words:
“ In respect to the exercise of certain corporate powers, and to the number, character, powers and duties of certain officers, municipal corporations are and shall be divided into the classes following: Cities of the first and cities of the second class, incorporated villages, and incorporated villages for special purposes.”
By the 44th section, the corporate authority of incorporated villages for special purposes, is vested in three "trustees; and by the 45th section, it is provided that, “ The said trustees shall have the exclusive supervision and control of all public roads, streets, and alleys, sewers and drains, constructed or to be constructed within the limits of such special road district.” They are also given very ample powers for laying off, constructing and keeping in repair, these works, with the power of levying assessments to meet the expenses, etc.; but they are invested with no other corporate authority whatever.
These corporations exist, for the most part, in the vicinity of large towns, and include very considerable districts of country territory, more densely populated than such districts generally are, but not sufficiently so to justify their municipal organization for general purposes. It need not be doubted that the word “ village,” in a general sense, would sufficiently, although not fully, describe one of these corporations; but the question is, in what sense was it used in the 5th section of the street railroad act? Looking at the connection in which it is used, to sundry other statutes employing the same language, to the objects intended to be accomplished, and, finally, to the fact, that the just rights of special road districts are full} provided for in the 7th section, we think it was intended to be confined to villages incorporated for general purposes, and invested with police powers over all the highways, and other public grounds within their limits. It is very clear that the legislature could not have referred to the existing *542 legal classification of municipal corporations — as “ towns,” in that, are wholly unknown — and to us, it seems equally clear, that they did refer to one that existed when these corporations were created, until recently the one known to the laws, and still more familiar to the public mind, than the one which has taken its place. This construction preserves all the language of the statute, and gives a definite signification to every word in it; while the other compels us to reject, as wholly unmeaning, the word “ towns,” and to include in the word “ villages,” a class of corporations, treated of in the very act of 1852, under the head of “ special road districts.”
There is no doubt, under the 7th section of the railway act, that the company must have obtained the consent of the trustees of the road district, before proceeding to lay down a track upon any public road under their control — they being the “ public authorities having charge thereof.” But it is found as a fact, that the railway track has been constructed as far as Kirby street, upon the roadbed of a turnpike company, by the consent of that company and the adjoining lot owners; and that the proposition is to extend the railroad from .there to the corporation limits, also upon the roadbed of the turnpike company, and in pursuance of a grant from that company. It will not be claimed, that this is one of the roads under “ the exclusive supervision and control ” of these trustees. Their powers and responsibilities are confined to the roads, etc., belonging to the public, and not committed by the legislature to the supervision and control of other agencies. This was so held, in respect to the supervisor of an ordinary road district, in Chagrin Falls & Cleveland P. R. Co. v. Cane, 2 Ohio St. Rep. 419; and there seems to be no distinction on that point, between that case and this. When, therefore, this railway company agreed with the “ company,” “ owning” and “ having charge” of the turnpike road, for the construction of their railroad upon the roadbed of that company, they fully complied with the 7th section of the act of 1861, and were under no obligation to obtain the further consent of the trustees of the municipal corporation.
If the construction of the railway had interfered with the *543 sidewalks, on tbe side of this turnpike road, the question would be presented whether they ought not to be regarded as under the control of the trustees; but the facts found do not warrant the inference that any such interference has occurred, or is proposed, and that question is not before us. These views lead to the result, that no public right, placed by law in the keeping of the trustees of this corporation, is involved in the action; and that, upon «the facts found in the court below, the petition, as to them, should have been dismissed.
2. And this brings us to the question, whether, upon these facts, a case is made for Eppel and Russell, also plaintiffs in the court below? For them it appears, that they are the owners and occupiers of improved lots, with dwelling-houses, shops, etc., erected thereon, fronting upon the northwesterly side of the turnpike road, between Kirby street and Knowlton’s corner. That in 1855, the grade of the highway was fixed by agreement between the turnpike company and the trustees of the road district, to which the roadbed, water ways, culverts, sidewalks, etc., had been made to conform; and that the railway track, between these points, as commenced by the company, and proposed to be laid down, was to be located on that side of the street, at an even grade with the roadway, and from two to three feet from the line of the sidewalk. They aver that such a location of the track “ will permanently and entirely prevent carriages, wagons and other vehicles from stopping in front of the houses, shops and stores on the northwestern side of the said street or highway, and will thus inflict irreparable injury on the several owners of the lots on which those houses, stores .and shops have been built, by rendering their premises untenantable for the purposes for which they have been improved.”
And the court has found: — “ That the railway track laid upon the side of the street, as proposed, will be an obstruction to the convenient access to the houses and other improvements on the northwestern side of the said highway, and would be more of an obstruction thereto than it would be if laid in the center of the highway; but that, taking into consideration all interests, namely, the adjoining owners of lots, the railway *544 company and the general traveling public, the location of the track as constructed and proposed to be constructed, is as little injurious as it would be in any other part of the highway.”
Street railroads are of very recent introduction; but they are so rapidly taking their place in all the cities and large towns of the state, and the country districts adjacent, as to make it desirable, both for themselves^and the public at large, that their legal status should be clearly understood. The legislature has inaugurated the policy of allowing them, by agreement with the public authorities or companies having them in charge, to occupy the public highways. It is very important to the railway companies, as well as these public authorities, that they should know what the one can lawfully grant, and the other lawfully take — where public interests end, and private rights begin.
If questions of this nature were now for the first time presented, they would, undoubtedly, be attended with much difficulty ; but we apprehend a ready solution of most of them, will be found in the application of principles long and very firmly established by the decisions of this court. In the present state of our legislation, the lawful right of one of these companies to occupy and use, in the manner and for the purposes provided by law, a public road or street, when no special and particular injury is done to any individual, can not be reasonably doubted. Any argument advanced to the contrary, must rest largely upon comparing these structures, to what they do not resemble. In either of the modes known to our laws, by which lands are acquired for a public highway, an interest, commensurate with the attainment of the objects of the acquisition, vests in the public at large, and is necessarily placed under the exclusive control of the law-making power. Whatever is fairly within the contemplation of a grant, whether voluntary or forced, and necessary to its beneficial enjoyment, is within the legal operation of the instrument or proceeding by which it is effected.
Among the most obvious of the incidents attending the acquisition of land for a common highway, is that of improving, *545 repairing and maintaining' it in the best possible manner, to facilitate travel and transportation. By what means or agen cies this end shall be accomplished, is a matter of pure legislative discretion, with which the owner of the land has no concern,, except as one of the public at large, and as such, conclusively bound by the action of their common representative — • the legislative body. Hence, we have held, that a plankroad or turnpike company, obligated to keep the road in repair and open to public use, may be lawfully put in possession of a common highway, and authorized to collect tolls to reimburse the expenditure, without laying any foundation for complaint, on the part of those from whom the land had been taken by the public. Chagrin Falls & Cleveland Plank Road Co. v. Cane, supra. The use of such a highway for the purposes of a street railroad, involves the application of new appliances and modes of travel, rather than of any new principle. In both, a corporation is employed and invested with rights in the highway; in both, an expenditure of money is required to put the road in a condition for use and to keep it in repair; but in both, the great leading object and public benefit is the accommodation of travelers, who may have occasion to use them at fixed tolls or rates of fare, and not the profit of the proprietors— “the profit to the proprietors being a mere mode of compensating them for their outlay of capital in providing and keeping up this public easement.” Shaw, C. J., in Commonwealth v. Temple, 14 Gray, 76. In truth, the street railroad involves a surrender of less of the public interest and control to the company than in the other case. In the one, an exclusive possession and management by the company, are absolutely essential to enable it to realize the compensation allowed; while in the other, the grant includes nothing more than the right to maintain in the highway, still occupied, controlled and used by the public as before, a structure adapted to the running of cars for the carriage of passengers. So far as the carrying of passengers by this mode is concerned, it differs in nothing from the exercise of the common right of carrying them by coaches or omnibusses; and everything needing a grant, or the further authority of law, is the right to place and *546 maintain in the highway, the necessary conveniences for this new description of carriages. When this grant is confined to a mere occupation of the easement, previously acquired by the public, although its enjoyment may require a restriction upon former modes, we can see nothing in it but the control, regulation and adjustment of a public right, so as to make it best answer the purposes, and meet the wants of all classes of the community. It does not exclude, or seriously interfere with the original modes in which the highway was used; but simply adds another, in furtherance of the same general object.
But while our decisions have been thus liberal, in allowing to the general assembly the largest discretion, in the management and control of easements acquired for public highways, we have been very careful to say, in the case to which reference has been made, as well as upon other occasions, that they could not be diverted to other purposes than those for which they were acquired; nor enlarged so as to accumulate additional burdens upon the land, or destroy or impair the incidental rights of the owner, appurtenant to his lands located upon the street or highway. The distinction lies between those things which fairly belong to the grant, and those which are reserved to the owner, or by law, attach as incidents to his property. For this purpose, there is no occasion to distinguish between lands acquired for ordinary highways, leaving the fee in the owner, and lands dedicated for streets in towns, where the fee vests in the municipal corporation, in trust to answer the purposes of the use. In either case, the interest acquired and used by the public at large, is an easement, of a definite character and held for the attainment of known objects ; and in either case, “ distinct from the right of the public to use the street, is the right and interest of the owners of lots adjacent.” With the fact, known and appreciated by everybody, that a large part of the value of lots in towns, was made up in reference to their location iipon streets, and with a long course of decisions, enforcing the liability of municipal corporations for invasions of this right, it still took nearly twenty years to bring it to a clear and definite description, But, at length, in the case of Crawford v. The Village of *547 Delaware, 7 Ohio St. Rep. 459, it was placed upon the true ground, as a right of property, protected by the constitution which could not be taken from the owner without compensation. The court say: “ The latter [lot owners], have a peculiar interest in the street, which neither the local nor the general public can pretend to claim; a private right of the nature of an incorporeal hereditament, legally attached to their contiguous grounds, and the erections thereon; an inci - dental title to certain facilities and franchises, assured to them by contracts and by law, and without which their property would be comparatively of little value. This easement, appendant to the lots, unlike any right of one lot owner in the lot of another, is as much property as the lot itself.” Upon a doctrine so just and necessary, and resting upon foundations so solid and satisfactory, it can matter very little, that our conclusions are not concurred in by the courts of some of our sister states. It is nevertheless the law of this state, and no longer open to doubt or question. This case also indicates very clearly, when, and under what circumstances, this private right of property can be said to be invaded. As we have already said, the acquisition of land for a highway of any kind, carries with it the right to put the ground in a suitable condition to answer the purposes of the acquisition; and to this public right, all private rights of lot owners are necessarily subordinated. If, before the public has exercised this right, through the regularly constituted authorities, the lot is improved, the owner must do so with reference to its reasonable and proper exercise thereafter; and can not complain if his means of access to his improvements are impaired through his own indiscretion. But when the public has taken posses: sion and regularly defined the interests and improvements necessary for its uses, by establishing grades, etc., lot owners have the right to assume this exercise of authority as a final decision of the wants of the public, and to make their improvements in reference to it. If any mistake is made, R is the mistake of the public Authorities, and it can not be corrected at the expense of those who have acted and expended their money upon the faith of its being final. This action on *548 their part, is, in legal effect, a distinct and appreciable division of the easement belonging to the public, and under its exclusive control, from that belonging to the owner of the lot, and incident to the lawful and beneficial enjoyment of his property. If, in the progress of improvement, the interests of the public require theirs to be enlarged, and his diminished, it can only be done upon making him compensation to the extent of his injury.
We have already had occasion to say, that it is a grave er ror to suppose, that a landowner who has granted, or from whom an easement has been taken for a public highway, while it is held to its original uses, could complain that it was taken from the control of the public authorities, and placed in the possession of an incorporated company; that 'it was changed from a dirt road to a plank or turnpike road; or that it was supported by tolls instead of a public tax: but it is a still graver error to suppose, that such an easement can, at the will of the public, be lawfully appropriated to the uses of any sort of a highway, without furnishing just cause of complaint on his part. So far is this from being true, that it is entirely clear, that such a change as necessarily and wholly excludes the particular uses for which it was acquired, would work an entire extinguishment of the easement; and it is equally clear, that, with the continued enjoyment of these uses, and in furtherance of the same general purposes, a new use might be authorized, requiring other adaptations, and imposing additional burdens upon the land, or destroying or impairing the owner's easement in the highway, which could not be legally resorted to without a further appropriation and compensation. The reasons for this have already been adverted to. Such changes and additions are not within the scope and spirit, or fair intendment, of the original grant or appropriation. The man who grants an easement for a common road, does not consent that the uses incident to such a work may be excluded, and the land burdened with the exclusive occupation of a locomotive railroad — although both are highways, and, each in its own way, facilitates travel and transportation. Such an easement, whether acquired by a voluntary grant or appropriation. *549 requires a certain reasonable and customary adaptation of the land, to all the various uses to which such a road is applied. What this will require, and what burden will be imposed upon the land, may be easily foreseen by him who grants it voluntarily, and easily estimated for him from whom it is taken by appropriation; and whatever it is, with the necessary incidents of maintaining it perpetually, constitutes the' public right and interest — all else is private right, and securely guarded from invasion by the constitution of the state. With this public right, the public, through its representative — the general assembly — may deal without restraint. It may regulate and modify the manner of using it by the public at large, and may, undoubtedly, devote its own interests to the maintenance of new structures, placed in the hands of other agencies, and calculated to advance and enlarge the general purposes for which the highway was originally constructed. But where these new structures, and new modes of travel, devolve additional burdens upon the land, and materially impair the incidental rights of the owner in the highway, they require more than the public has, or can grant, and the deficiency can only be supplied by appropriating the private right, upon th6 terms of the constitution.
An application of these principles to the case under consideration, leaves no doubt as to how it must be decided. Allowing the turnpike company to have succeeded to all the rights and interests of the public in the county road, and the railroad company to have obtained a plenary grant from the turnpike company, yet, it is plain, that the former could make no encroachment upon these lot owners, which the latter could not; and it does not admit of a doubt, that after the turnpike company had established its grade, and improved its road, and the lot owners had conformed their improvements to its actual condition, that it could legally make no change, which destroyed or impaired access to their buildings, without making full compensation for the injury. We see nothing in the street railroad act which induces the belief, that the legislature intended to authorize, either companies or public authorities, to grant to railway companies anything more than an in *550 terest in the public easement; nor do we see any reason to doubt, that such a location may ordinarily be made, as to bring the necessary structures for the use of these companies within that interest, and without any invasion of private rights. But if it were otherwise, and it were manifest that the legislature intended to allow these companies to occupy and impair the easements attached to improved lots, and that the necessary structures could not otherwise be constructed or used, we should still be of the opinion that it could not be done without compensation. It is found as a fact, that the proposed construction of this railway track, “ will be an obstruction to the convenient access to the houses and other improvements ” of the lot owners; “ and more of an obstruction thereto than it would be if laid in the center of the highway.” It is true, it is added, that taking into consideration the interests of the company, and the general traveling public, as well as those of the lot owners, the location “ is as little injurious as it would be in any other part of the highway.” This is the common case, when private property is taken for public uses. Reduced into plain English, it simply amounts to this, that the company and the public will gain as much as the lot owners lose. The difficulty of giving this any effect, in the present case, arises from the fact, that the justice of the constitution has provided ‘that what the one thus gains, and the other loses, shall be paid for, before the property is taken or invaded.
Upon the whole case, our opinion is, that the court below erred in holding the road district entitled to maintain the action, and in making the further extension of the railway dependent upon the consent of the trustees thereof; and for this cause, the judgment must be reversed. And proceeding to render such judgment, upon the facts there found, as, in our opinion, the law requires, we shall order the petition as to the road district to stand dismissed Avith costs; and in behalf of the remaining plaintiffs, Eppel and Russell, we shall order the railway company to stand enjoined from the further extension of their track, upon the line proposed, until they have legally acquired the right to do so, by obtaining the consent of these *551 lot owners, or otherwise acquiring their interests in the highway.
■Brinkerhoee, C.J., and Scott, Wilder and White, JJ., concurred.